IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No.   13-cv-02661-WYD-MEH

DANIELE CHAFIN,

      Plaintiff,

v.

NICHOLAS STASI;
KELLI JAYCOX;
MICHAEL KELLY, and
THE CITY OF DURANGO,

      Defendants.

---

## ORDER ON SUMMARY JUDGMENT MOTIONS

---

I.    <u>INTRODUCTION</u>

    THIS MATTER is before the Court on cross motions for summary judgment.

Defendants filed a Combined Motion for Summary Judgment and Memorandum Brief in

Support Thereof on May 29, 2014.  A response was filed on October 2, 2014, and a

reply was filed on November 4, 2014.  Plaintiff's Motion for Summary Judgment was

filed on September 4, 2014.  A response was filed on September 29, 2014, and a reply

was filed on November 4, 2014.  Accordingly, the motions are fully briefed.

    This lawsuit arises out of Plaintiff's use of the swimming facilities at the Durango

Community Recreation Center ["DCRC"], a facility open to the public in Durango, and a

charge of harassment made against Plaintiff by an employee of DCRC which resulted in

Plaintiff not being able to use the facilities for a period of time.  Defendants seeks

summary judgment with respect to all claims asserted within Plaintiff's Second

Amended Complaint, including violation of the Fourteenth Amendment Due Process

Clause; (2) declaratory judgment of Plaintiff's rights under the First Amendment,

Fourteenth Amendment and Colo. Rev. Stat. § 18-9-110; (3) municipal liability against

the City of Durango; and (4) retaliation for protected speech in violation of the First

Amendment.  Defendants also assert that the individual defendants are entitled to

qualified immunity.  Plaintiff filed a cross motion for summary judgment as to the claims.

II.   <u>FACTUAL BACKGROUND</u>

I note at the outset that I have considered all the facts alleged by the parties, as

well as the responses and replies as to these facts, but have recited only those facts I

deem most material to my ruling.  Exhibits submitted by Defendants' are referenced by

letter, *i.e.,* Exhibit A.  Exhibits submitted by Plaintiff are referenced by number, *i.e,*

Exhibit 1.  To the extent Plaintiff asserts that he was not able to depose certain

witnesses and that he should be allowed to take discovery before the summary

judgment motion is resolved, I deny Plaintiff's request under Fed. R. Civ. P. 56(d).

Plaintiff did not show with specificity the facts he  believes will be uncovered through

additional discovery.  *See Jensen v. Redev. Agency*, 998 F. 2d 1550, 1554 (10th

Cir.1993).

I also note that legal argument made by a party opposing a summary judgment

motion when disputing a fact is not sufficient to create a genuine issue of material fact,

*see* Section III.B.7 of my Practice Standards, nor are facts stated in response that are

extraneous to the dispute and/or not supported by evidence.  Also, conclusory or

allegations that are unsupported by evidence do not create a genuine issue of fact. *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1237 (10th Cir. 2004). Finally, to the extent portions of the affidavits submitted with the summary judgment motions are conclusory and/or self-serving, those portions will not be considered. *Ellis v. J.R.'s Country Stores, Inc.*, ___ F.3d ___, 2015 WL 1004715, at *15 (10th Cir. 2015) (citing *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002)).

I now turn to the facts. As noted earlier, this case arises out of Plaintiff's use of the swimming pool at the DCRC. Plaintiff asserts that he needed to use the pool to help alleviate back pain as suggested by his chiropractor and that there was no other location in La Plata County where he could swim indoors.

It is undisputed that on October 10, 2011, police officer Nicholas Stasi ["Officer Stasi"] was dispatched to the DCRC to investigate a complaint of harassment against Plaintiff. There, he met with employees Ashleigh Woodward ["Woodward"] and Ann Camp ["Camp"]. According to Defendants, Woodward informed Officer Stasi that she had been harassed by Plaintiff from approximately January of 2011 through that day. (Ex. A, Aff. of Officer Stasi [hereinafter "Stasi Aff."], ¶ 4; Ex. B, Aff. of Kelli Jaycox ["Jaycox"] [hereinafter "Jaycox Aff."], ¶ 4.) Plaintiff admits that Woodward made a report, but denies that he harassed or threatened her. This explanation is not, however, responsive to Defendants' asserted fact. Thus, I deem Defendants' fact undisputed.

Defendants assert that Plaintiff frequented the DCRC and would repeatedly ask Woodward to go out with him. They state that because Woodward was uncomfortable with Plaintiff's behavior, she asked him to stop his advances. Nonetheless, Plaintiff still

approached Woodward and began to keep track of her work hours.  Defendants assert

that Woodward told Officer Stasi that she was very afraid of Plaintiff and not sure what

he was capable of.  (Ex. A, Stasi Aff., ¶ 4; Ex. B, Jaycox Aff., ¶ 4; Ex. C, Aff. of Probable

Cause Subsequent to Warrantless Arrest; Ex. D, Pl.'s Record of Meeting with Ann,

Supervisor at Durango Recreation Center (highlighted portions).)

        In response to the facts in the previous paragraph, Plaintiff admits that he asked

Woodward out.  He denies that she told him to stop his advances or that he kept track

of her work hours.  (*See* Ex. 1, Daniele Chafin's Aff. [hereinafter "Pl.'s Aff."], ¶ 1.)

Plaintiff states he does not know if Woodward was afraid of him, but asserts that she

never appeared that way when he was in her presence.  (*Id.*)  He also denies that he

intended to harass Woodward.  (*Id.*)  That is not, however, responsive to the facts as

asserted by Defendants.  Thus, I deem Defendants' facts in the previous paragraph to

be undisputed.

        It is undisputed that on October 7, 2011, Plaintiff went to the DCRC.  Defendants

assert that Plaintiff went there to obtain Woodward's last name and work schedule.

When Plaintiff's demeanor became loud and angry, Camp agreed to meet with him.

During the meeting, Plaintiff told Camp that Woodward was stealing hours from the

DCRC.  Camp had no concerns or evidence that Woodward was not working her

required schedule, but was concerned for Woodward's safety.  (Ex. A, Stasi Aff., ¶ 5.)

        In response to the facts submitted by Defendants in the previous paragraph,

Plaintiff denies that his demeanor on October 7, 2011, was loud and angry.  (Ex. 1, Pl.'s

Aff., ¶ 1.).  I deem this to be a disputed fact.  Plaintiff then makes a number of improper

arguments and raises extraneous facts that are not responsive to the facts alleged by

Defendants.  Accordingly, I deem the remainder of the facts asserted by Defendants in

the foregoing paragraph to be undisputed.[1]

      In Camp's incident description of the meeting with Plaintiff on October 7, 2011,

she states that he talked about his political views, that the events of 9/11 "were

deliberately planned and coordinated by the government", and "about taking down

President Obama and New York Mayor Michael Bloomberg".  (Ex. 11.)  She also

mentioned as "highlights from the conversation in an attempt to pinpoint his reasons for

distress" that Plaintiff said he was a whistleblower of the federal government; that Amy

Goodman, a reporter from Chicago, sent Woodward to Durango to spy on him; and that

Woodward was not working her 40 hours and she should investigate.  (*Id.*)  Plaintiff

cites to no evidence in the record, nor is there any, that this information was relayed by

Camp to Jaycox or Kelley at that time, named Defendants who were at all relevant

times employees of the DCRC.  Camp is not a Defendant.

      As to Officer Stasi, while there is no evidence that he saw the incident report

discussed in the previous paragraph, he does indicate in his October 2011 officer report

that he was told by Camp that Plaintiff believed Woodward was a spy, that Plaintiff had

stated he was a federal whistleblower, and that he would go on rants about 9/11 and the

United States government.  (Ex. 9.)  Officer Stasi also states in that report that Camp

was very concerned about Plaintiff's behavior and that he might try to harm her or other

---

[1] I also disregard Plaintiff's arguments and extraneous facts raised in response to other factual
assertions by Defendants.

DCRC employees.  (*Id.*)  As a result, she asked him to contact Plaintiff and tell him that

he was trespassed from DCRC and was no longer allowed to return.  (*Id.*)

Based on his behavior at the DCRC, Defendants assert that Camp and

Woodward were frightened of Plaintiff and the potential safety concerns he posed.

Because of these concerns, Defendants state that the DCRC wanted to issue a refund

for the remainder of Plaintiff's recreation pass and did not want him to return.  (Ex. A,

Stasi Aff., ¶ 6; Ex. B, Jaycox Aff., ¶¶ 4-6.)  While Plaintiff denies these facts, he has not

presented any evidence that refutes them.  Thus, I deem the facts in this paragraph

undisputed.  Moreover, it is undisputed that the police were initially called because

Camp and Woodward complained about Plaintiff's behavior.

At the request of Camp and Woodward, Officer Stasi contacted Plaintiff at his

residence later in the afternoon on October 10, 2011.  Officer Stasi explained Camp's

and Woodward's concerns to Plaintiff and advised that because of his harassment and

DCRC employees' concerns about their safety, he was trespassed from using the

DCRC facilities at that time and would be issued a refund for his pass.  Plaintiff admits

these facts, except that he was not told Camp and Woodward were frightened of him.[2]

Plaintiff asserts that Camp agreed with Officer Stasi's suggestion to revoke his pass.

Also on October 10, 2011, after his conversation with Officer Stasi, Plaintiff called

the DCRC about a refund for his pass.  According to Defendants, he yelled at

administrative assistant Pat Lougee ("Lougee").  (Ex. A, Stasi Aff., ¶¶ 9, 11.)  Plaintiff

---

[2] It is immaterial whether Woodward and Camp expressed fear to Plaintiff, as it is undisputed that they expressed this fear to Officer Stasi and asked for police assistance because of Plaintiff's behavior.

denies yelling at Lougee, stating that he was civil with her; that he never raised his voice, screamed or made any threats to her; that she did not seem upset or indicate that she was threatened; and that nothing he said to her would have caused her to reasonably feel threatened.  (Ex 1, Pl.'s Aff., ¶ 8.)  Plaintiff asserts that he told Lougee that he was unjustly evicted from DCRC and needed to swim there to treat his back problem.  (*Id.*)  He asked her to plead with Camp to withdraw the eviction, and that he would not persevere with his allegations of wage theft by Woodward.  (*Id.*)  I deem whether Plaintiff yelled at Lougee to be a disputed fact.

Defendants also assert that Lougee felt threatened by Plaintiff's behavior and was uncomfortable with the thought of Plaintiff's presence at the DCRC.  I deem this fact admitted.  While Plaintiff contends that Lougee did not seem upset, this is merely Plaintiff's subjective belief and does not contradict what Lougee stated to Officer Stasi.

In the afternoon of October 10, 2011, Plaintiff left a voice message for Camp at the DCRC, which Defendants contend was threatening.  The voicemail called Camp "a sorry sack of shit" at least three times as well as an evil person and a fascist. Approximately three minutes in length, Plaintiff's parting comment was along the lines of "this isn't over."  (Ex. A, Stasi Aff., ¶ 10; Exhibit C, Aff. of Probable Cause Subsequent to Warrantless Arrest at p. 2; *see also* Ex. E, CD containing Plaintiff's recorded voice message.)  While Plaintiff admits that he left the voice mail, he asserts that it stated no threats and explicitly disavowed harmful, physical actions.  (Ex. 1, Pl.'s Aff., ¶ 9.) Plaintiff asserts in that regard that he told Camp in the message that he would never hurt people or property, and that he never made any threats of injury to people or

property.  (*Id.*)  He states that he said, "this isn't over" because he needed to use the pool as therapy for his back condition.  (*Id.*)  I find that the only dispute with respect to the facts in this paragraph is whether Plaintiff's voice mail was threatening.  The voicemail speaks for itself on this issue.

Because of Plaintiff's continued threatening behavior and the voice message, Camp decided to press charges against Plaintiff.  (Ex. A, Stasi Aff., ¶ 12.)  In response, while Plaintiff denies making any threats, this does not refute the fact that Camp found the behavior threatening and decided to press charges.

It is undisputed that Officer Stasi returned to Plaintiff's residence on October 10, 2011, and arrested Plaintiff for harassment and for resisting arrest.  It is also undisputed that Officer Stasi did not arrest Plaintiff based on Colo. Rev. Stat. § 18-9-110.

Plaintiff asserts that Officer Stasi came to his residence with another officer.  (Ex. 1. Pl.'s Aff., ¶ 11.)  Officer Stasi did not ask him what happened, and did not tell him he was under arrest.  (*Id.*)  Plaintiff asserts that when he turned to go back into the house, the officers grabbed his arms from behind, tried to trip him and had their hands on him.  (*Id.*)  When he asked what they were doing, the officers then told him he was under arrest.  (*Id.*)  Plaintiff states that he did not resist arrest at that time, but they forced him to the ground and did not ask him to extend his hands to be handcuffed.  (*Id.*)  Plaintiff also asserts that Officer Stasi told him he could not go back to the DCRC, for he was permanently trespassed.  (*Id.* )  Defendants deny the majority of these facts, but the facts regarding how the arrest transpired are immaterial to the analysis as Plaintiff has not alleged claims related to the manner in which he was arrested.

When Officer Stasi contacted Plaintiff on October 10, 2011, Plaintiff became irate and yelled that Officer Stasi was violating his constitutional rights.  He said Woodward was a spy and was stealing hours from the DCRC, and complained that Officer Stasi was a fascist and police are like Nazis.  He voiced concerns the government is against him and that multiple high-level government employees are in "cahoots" with the DCRC to violate his rights.  Officer Stasi did not believe these comments constituted complaints against the DCRC or the City of Durango.

After Officer Stasi arrested Plaintiff on October 10, 2011, it is undisputed that he briefly reviewed a portion of Plaintiff's online political blog.  (Ex. A, ¶ 13.)[3]  He also looked at the blog a few additional times in the months following October 2011.  (*Id.*)  He saw no substantive changes and the blog was ultimately deleted.  (*Id.*)   Officer Stasi testified, however, that the blog had no relevance to Plaintiff's arrest or his harassment of DCRC employees.  (Ex. A, Stasi Aff., ¶ 13.)  Plaintiff denies this, asserting that the blog which Camp told Officer Stasi about did have relevance, citing an e-mail wherein Camp gave Officer Stasi Plaintiff's blog address before the arrest.  (Ex. 23.)  Defendants contend, and I agree, that the information provided by Plaintiff does not contradict Defendants' assertion that the blog had no relevance to the arrest for harassment.  Plaintiff cites to no evidence to dispute that Officer Stasi reviewed the blog *after* Plaintiff's arrest.  Further, he cites no evidence to dispute that the blog was not a ground for Stasi's arrest of Plaintiff.

_____

[3] He states in his Officer Report that the blog "is a long rant about 9/11 conspiracies and extremely anti-government with a lot of focus against Barack Obama."  (Ex. 9; *see also* ECF No. 44, Blog Entries, Exs. 1, 2 and 3.)

Defendants assert that neither Jaycox nor Kelly have ever reviewed Plaintiff's online blog. (Ex. B, Jaycox Aff., ¶ 11; Ex. H, Kelly Aff. ¶ 12.) Plaintiff admits that they state this, but deny that they did not know of the blog and its contents. This is, however, unsupported speculation. Thus, I deem Defendants' fact to be undisputed.

A protection order regarding Camp, dated March 9, 2012, entered against Plaintiff as part of his criminal case for harassment. (Ex. G.) It precluded Plaintiff from being within 1000 feet of Camp, but does not mention the DCRC. (*Id.*) Because both Camp and Woodward complained about Plaintiff's harassment, however, Defendants assert that both women believed they had protection orders against Plaintiff. (Ex. B, Jaycox Aff., ¶¶ 12-13.) While Plaintiff denies that there was a reasonable basis for Woodward to believe she had a protection order against Plaintiff as she did not file a criminal complaint, he cites no evidence to dispute this fact. Indeed, the District Attorney's Office for the Sixth Judicial District requested protection orders for both Camp and Woodward and referenced three victims in e-mails regarding the entry of protection orders. (Ex. I, e-mails dated November 22, 2011; Ex. J, Motion to Impose Protection Order dated January 11, 2012.)

Defendants assert that Plaintiff understood that protection orders were entered pertaining to both Camp and Woodward. (*See* Ex. K, Pl.'s Mot. to Grant Mot. to Impose Protection Order dated February 12, 2012; Ex. L, Plaintiff's letter to Assistant District Attorney Simonton, dated June 11, 2012 (highlighted portions).) While Plaintiff denies this, he cites no evidence to dispute this fact. Accordingly, I deem it admitted.

It is undisputed that Jaycox, Kelly, and Officer Stasi were not involved in Plaintiff's criminal case.  Defendants assert that they did not know any details related to the terms of Plaintiff's conviction or deferred sentence.  (Ex. A, Stasi Aff., ¶ 16; Ex. B, Jaycox Aff., ¶ 7; Ex. H, Aff. of Michael Kelly ["Kelly Aff."], ¶¶ 4-5.)  Plaintiff denies this, noting among other things that Officer Stasi accessed the protection order in the NCIC database on November 23, 2012.  Most of Plaintiff's response is argument and/or the assertion of extraneous facts that do not refute Defendants' assertion that the individual Defendants did not know the details related to the term of Plaintiff's conviction or deferred sentence.

According to Defendants, Camp and Woodward were likewise uninvolved in the criminal case and had no knowledge of the conditions of Plaintiff's deferred sentence. (Ex. B, Jaycox Aff., ¶¶ 12-13.)  While Plaintiff denies this, citing to the fact that Camp had possession of the protective order pertaining to her, this does not show that she was actually involved in the criminal case or that she had knowledge of the conditions of Plaintiff's deferred sentence.  There is also no evidence that Camp provided Defendants with a copy of the protection order.

The protection order does not have an expiration date.  (Ex. A, Stasi Aff. ¶ 17.) While Plaintiff denies this, this is clear from the order itself.  (Ex. G.)  The protection order does state, however, that it "remains in effect until final disposition or further order of the Court."  (Ex. G.)  According to the order, "until final disposition" means "until the case is  dismissed, until the Defendant is acquitted, or until the Defendant completes his/her sentence."  (*Id.*)

It is undisputed that Plaintiff had to complete all requirements of his deferred sentence by November 15, 2012.  Further, Defendants assert that the La Plata County District Court's Order does not state that the terms of Plaintiff's deferred sentence end on November 15, 2012.  (Ex. M, Sentencing Order/Mittimus dated November 11, 2011.)  While Plaintiff admits that he had to complete the requirements of his deferred sentence by November 15, 2012, he states that he did complete these requirements by that date, citing to Exhibits 31 and 32 of his motion.  Those exhibits do not, however, address that issue.  Nonetheless, I find that Plaintiff did complete the requirements of his deferred sentence as his criminal case was closed as discussed below.

Plaintiff's criminal case was closed on November 27, 2012.  (Ex. N.)  Plaintiff asserts, however, that the Motion and Stipulation for Deferred Sentencing signed by the judge on November 15, 2011, orders that all charges would be dismissed with prejudice on November 15, 2012.  (Exs. 31, 32.)  Thus, Plaintiff appears to contend that the protection order expired on November 15, 2012, as that is when the case was supposed to be dismissed.[4]

However, on November 23, 2012, a court clerk at the La Plata County District Courthouse advised Plaintiff that the protection order was still active because it was initiated in February of 2012.  (Ex. R, Pl.'s Record of Visit to La Plata County Courthouse on November 23, 2012 (highlighted portions).)  While Plaintiff admits this, he states that this was erroneous.  He points out that after talking to her supervisor, the

_____

[4] He also refers to the protection order being valid for a year.  I will presume that Plaintiff takes the position that the protection order expired on November 15, 2012.

clerk then returned and admitted that the protection order was supposed to have expired already but that the judge would not return until November 26, 2012 "to correct the error."  (*Id.*)

It is undisputed that Plaintiff did not use the DCRC facility from October 10, 2011 until November 19, 2012 at which time he used the swimming pool without incident.

On November 21, 2012, Plaintiff was observed swimming in the DCRC pool. Woodward was scheduled to work on that date.  Defendants assert that because DCRC employees, including Jaycox and Kelly, knew about Plaintiff's prior behavior and the protection order prohibiting his presence near DCRC employees and knew that Plaintiff had not returned to the DCRC in over one year, Jaycox and Kelly approached Plaintiff. (Ex. B, Jaycox Aff., ¶¶ 3-5; 7-10; Ex. H, Kelly Aff., ¶¶ 3-4, 7; Ex. P; Ex. Q, Pl.'s Answer to Interrog. No. 3.)[5]  Also according to Defendants, because Plaintiff had not returned to the DCRC for a year and because they believed a protection order was in existence, Jaycox asked Plaintiff to leave the DCRC while she investigated, and Plaintiff complied. (Ex. B, Jaycox Aff., ¶ 10; Ex. H, Kelly Aff., ¶¶ 3-8; Ex. O, p. 1 ¶ 2 and p. 2 (highlighted portions).)[6]  Defendants admit that prior to excluding him, Jaycox read Camp's incident report and reviewed photographs of Plaintiff taken from video surveillance.  She told him

---

[5] Plaintiff denies that Jaycox or Kelley were aware of his previous behavior, but cites no evidence to contest their evidence as to this issue.  Thus, I deem the facts asserted by Defendants in this paragraph to be undisputed.

[6] While Plaintiff denies this, stating that it is not clear why Jaycox and Kelley excluded him and that Jaycox did not do a reasonable investigation, this is not responsive to the facts as alleged by Defendants.  Thus, I deem Defendants' facts in this paragraph to be undisputed.

to leave because she believed the protection order was still in place and also believed it applied to Woodward.

Thus, according to Defendants, Jaycox's and Kelly's communication with Plaintiff on November 21, 2012, was based on their understanding that Plaintiff was prohibited from being at the DCRC in light of his past behavior and a protection order.  (Ex. B, Jaycox Aff., ¶ 8; Ex. H, Kelly Aff., ¶ 12; Ex. O (highlighted portions).)  While Plaintiff denies this in part, he does not present evidence that refutes Defendants' assertion.  He does assert, however, that he told Jaycox on November 21 that he faced retaliation as a result of a political cover-up, that Woodward was protected by the Mayor of Chicago, and that DCRC had "seized" on his visit for political purposes.  (Ex. O.)  Plaintiff also asserts that Jaycox told him that he was permanently banned from the DCRC, even if the protection order had expired.  (Ex. 1, Pl.'s Aff., ¶ 15.)

Between November 21 and 23, 2012, it is undisputed that Jaycox communicated with Camp, Woodward, and Officer Stasi regarding Plaintiff's reappearance. Defendants assert that Jaycox and Officer Stasi continued to believe that the protection order was valid despite attempts to obtain additional information.  (Ex. A, Stasi Aff., ¶ 17; Ex. B, Jaycox Aff., ¶¶ 12-16.)  While Plaintiff admits that Jaycox and Officer Stasi stated they believed this, he denies that a reasonable person would have believed this. He asserts that a reasonable person would have done an investigation, and that Jaycox refused to conduct one.  Plaintiff did not cite any competent evidence that actually refuted Defendants' assertion; thus, I deem it admitted.

-14-

According to Plaintiff, a November 23, 2012, e-mail from Jaycox to Officer Stasi stated she "told [Plaintiff] from what I understood that he was no longer allowed back here at all and it didn't matter what happened with the court." (Ex. 1, Pl.'s Aff., ¶ 15.) Officer Stasi responded, "He may have completed all court stuff but it's my understanding and you can clarify that he is trespassed from there for life and can never return. I'll be happy to call him and tell him he can never return if you like." (*Id*.) Jaycox replied, "Good, that makes it better. Would you mind calling him and letting know that he can never return." (*Id*.) Stasi later replied, "I spoke with Dan today and informed him that he's no longer allowed at the rec center. . . .If he goes back let me know." (*Id*.)

Also on November 23, 2012, Officer Stasi looked up Plaintiff's name through the National Crime Information Center ["NCIC"] and discovered the protection order pertaining to Camp appeared to still be valid, particularly as protection orders are typically in place for one year after the date of issue. (Ex. A, Stasi Aff., ¶ 17.) While Plaintiff denies that Officer Stasi conducted a reasonable investigation, this is not responsive to Defendants' assertion.

It is undisputed that Officer Stasi called Plaintiff on November 23, 2012 to discuss the terms of the protection order. According to Plaintiff, at that time Officer Stasi did not advise Plaintiff he would be arrested if he ever went back to the DCRC, but that he would be arrested if he violated the terms of the protective order which he believed was still in place. (*See* Pl.'s Mot. Summ. J., Movant's Statement of Material Facts ¶ 35.) He also states, contrary to other his other statements, that Officer Stasi

never advised Plaintiff he was permanently (or, according to Plaintiff, "infinitively") banned from the DCRC.  (*Id.*)

Officer Stasi's only contact with Plaintiff was on October 10, 2011, and on November 23, 2012.  Plaintiff asserts that the contacts on both dates occurred after his complaints about the conduct of DCRC staff, his conduct, and what was stated in his blogs, which Officer Stasi and Camp read.  (Ex. 1, Pl.'s Aff., ¶ 11.)  Defendants deny this, asserting that it is undisputed that the contact between Officer Stasi and Plaintiff occurred in response to Plaintiff's harassment of DCRC employees and the existence of a protection order and was unrelated to any complaints by Plaintiff.  It is also undisputed that Officer Stasi had not read the blog when he arrested Plaintiff on October 10, 2011. The only contact between Plaintiff, Jaycox and Kelly occurred on November 21, 2012.

During all three instances of contact between Plaintiff, DCRC employees, and Officer Stasi in October 2011 and November 2012, Defendants assert that Plaintiff's comments concerned his perceived unfairness regarding the consequences of his behavior at the DCRC.  (Ex. A, Stasi Aff., ¶ 12; Ex. B, Jaycox Aff., ¶ 10; Ex. H, Kelly Aff., ¶¶ 8-9; Ex. O.)  Plaintiff denies this in part, stating that he commented to Jaycox, Kelly and Officer Stasi about his treatment at DCRC as well as about policies issues such as are referred to in his blog.  (*See* Ex 1, Pl.'s Aff., ¶ 32.)

Plaintiff wrote on June 11, 2012, "I truly regret my actions on October 7 and 10, 2011…I called Camp…to discuss the verbal trespass notice I received earlier that day from Officer Stasi…I reiterate my total lack of  malice towards [Camp and Woodward]... I am not a hateful or violent person and have forgiven these ladies for their contribution

to my arrest.  Subsequent to my arrest, I have at no time ever felt inclined to communicate or approach them for any purpose and I fully intend to continue that policy even after the expiration of the Protection Order… it would be in the best interest of all concerned parties for me never to return to [DCRC] and..to permanently continue to act as if Protection orders were in effect for [Woodward and Camp].  I deeply regret my misguided behavior…and I vow never to repeat such behavior.  (Pl.'s Mot. Summ. J., Movant's Statement of Material Facts ¶ 38.)

According to Plaintiff, his attorney spoke to a city attorney in February and March 2013 about his ability to use the DCRC.  (Pl.'s Mot. Summ. J., Movant's Statement of Material Facts ¶ 35.)  He states, "[i]n a recording of DCRC employee Gregg, he agreed Plaintiff was permitted at the DCRC and did not ask him to leave." (*Id.*)  Plaintiff has used the DCRC facilities without incident since June 17, 2013.  (*Id.*; *see also* Ex. A, Stasi Aff., ¶¶ 18-19; Ex. S, Pl.'s Individual Visit History Report; Ex. T, Pl.'s Answer to Req. for Admis. No. 3.)  Plaintiff asserts, however, that he is still subject to being told to leave.  He also asserts that he is still subject to arrest given Officer Stasi's order not to use the facilities and the fact that his statement that he is trespassed for life has not been rescinded.  (Ex. 1, Pl.'s Aff., ¶ 37.)

After Plaintiff returned to the DCRC in 2012, Defendants assert that he was only asked to leave the one time— on November 21, 2012.  (Ex B, Jaycox Aff., ¶¶ 17-19; Ex. H, Kelly Aff., ¶¶ 9-11; Exs. P and Q, Answer to Interrogatory No. 3.)  Plaintiff denies this, stating that on June 8, 2013, Greg Peary, the DCRC recreational assistant, suggested to him as he was leaving the facility that he should not be at the DCRC.  (Ex. 1, Pl.'s

Aff., ¶ 38.) He also asserts that on February 14, 2013, Camp said in an e-mail that while Woodward had been told that his protection order had expired because he had served his sentence, she was not comfortable with him returning to the DCRC. (*Id.*) I find that these statements do not contradict Defendants' assertion that Plaintiff was only actually asked to leave on the one occasion on November 21, 2012.

According to Defendants, it is undisputed that Plaintiff was not permanently trespassed or banned from the DCRC nor was any prohibition on his presence due to conduct of Defendants. (Ex. B, Jaycox Aff., ¶ 18; Ex. H, Kelly Aff., ¶ 11; Ex. O, p. 2, ¶ 2 (highlighted portion).) I disagree, finding that there are genuine issues of material fact about this issue. Officer Stasi's October 10, 2011 e-mail states Plaintiff was instructed that his refund for use of the DCRC facility would be mailed to his house and that "he is to have no contact with any employee of the Rec center through phone or in person." (Ex. 23.) A November 23, 2012 e-mail from Jaycox to Officer Stasi states that she told Plaintiff in November 2012 that he was no longer allowed back at DCRC, that he was permanently banned, and it did not matter what happened with the court. (Ex. 1, Pl.'s Aff., ¶ 15.) Officer Stasi told Jaycox later that day in an e-mail that he had spoken to Plaintiff and "informed him he is no longer allowed at the Rec Center" and that he is trespassed. (*Id.*) Plaintiff also asserts that he was told by Officer Stasi that even if the protection order had expired, the DCRC's trespass was for life, and that he would be arrested if he returned. (*Id.*, ¶¶ 15, 34.) According to an e-mail in February 2013, Officer Stasi again told Plaintiff that he was trespassed from using the facility. (See Ex.

7.)[7]  I note, however, that Plaintiff also stated in his motion that Officer Stasi "never advised Plaintiff he was infinitely banned from the DCRC."  (Pl.'s Mot. Summ. J., Statement of Material Fact 35, p. 17.)  Construing the evidence in the light most favorable to Plaintiff for purposes of Defendants' motion, I will find for purposes of the summary judgment motions that Plaintiff was told by Officer Stasi that he was trespassed for life from the DCRC and that he would be arrested if he returned.  Finally, Plaintiff asserts that Officer Stasi banned him from speaking to any DCRC employees at any time.  (Exs. 7, 10, 23, 24, 25, 26, 39.)

Similarly, Defendants assert that Plaintiff was never subjected to alternative conditions at the DCRC.  (Jaycox Aff., ¶ 17; Ex. H, ¶¶ 9-10.)  Plaintiff denies this, asserting he was subject to a lifetime ban from DCRC or one for a lesser period whose duration is unknown.  Again, Plaintiff asserts that Officer Stasi told him he would be arrested if he returned and that he was banned from speaking to DCRC staff, which has not been rescinded.  (See Ex. 7, February 14, 2013 e-mail from Officer Stasi indicating that he was asked by DCRC to give Plaintiff a trespass notice from the DCRC even though the court case was over).  However, it is undisputed that despite what may have been told to Plaintiff by Officer Stasi or anyone else, no DCRC employee ultimately permanently banned him from the DCRC.  This is because it is undisputed that he has been using the facility without incident or restriction since June 2013.

---

[7] Officer Stasi's February 2013 e-mail also states "Chafin voiced multiple concerns the government is against him and multiple high level employees are in cahoots with [DCRC] to violate his rights."  (Ex. 10.)

III.   ANALYSIS

A.   Standard of Review

Summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit."  *E.E.O.C. v. Horizon/ CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).  "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Id.*

The burden of showing that no genuine issue of material fact exists is borne by the moving party.  *Horizon/ CMS Healthcare Corp.*, 220 F.3d at 1190.  "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"  *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted).  When applying the summary judgment standard, the court must "'view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'"  *Id.* (quotation omitted).  All doubts must be resolved in favor of the existence of triable issues of fact.  *Boren v. Sw. Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

When cross motions for summary judgment are filed, the court is "'entitled to assume that no evidence needs to be considered other than that filed by the parties, but

summary judgment is nevertheless inappropriate if disputes remain as to material facts.'" *Atl. Richfield Co.*, 226 F.3d at 1148 (quotation omitted).  Cross motions for summary judgment must be treated separately—the denial of one does not require the grant of another.  *Buell Cabinet v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).  I address the arguments made in the motions in connection with my discussion of the claims.

      B.    The Parties' Arguments

          1.    Whether Defendants Are Entitled to Qualified Immunity

      Defendants first assert that the individual Defendants are entitled to qualified immunity.  In *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), the Supreme Court held that government officials performing discretionary functions are shielded from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known."  *Harlow* places a presumption in favor of immunity of public officials acting in their individual capacities.  *Schalk v. Gallemore*, 906 F.2d 491 (10th Cir. 1990).  Qualified immunity is an immunity from suit rather than a mere defense to liability.  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

      A plaintiff can overcome the presumption of qualified immunity "only by carrying the heavy burden of showing both that (1) the  defendant-officer in question violated one of his constitutional rights, and (2) the infringed right at issue as clearly established at the time of the allegedly unlawful activity such that 'every reasonable officer would have understood that what he [was] doing' violated the law."  *Kerns v. Bader*, 663 F.3d 1173,

1180 (10th Cir. 2011) (quoting *Ashcroft v. al-Kidd*, ___ U.S. ___, 131 S. Ct. 2074, 2080,

2083 (2011)).  "Failure on either qualified immunity element is fatal." *Id.*

The court has "the freedom to decide 'which of the two prongs of the qualified

immunity analysis should be addressed first in light of the circumstances in the

particular case at hand.'" *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010)

(quotation omitted).  The two-step sequence is not mandatory, and the defendant may

be "entitled to qualified immunity on the ground that it was not clearly established at the

time of the search that their conduct was unconstitutional." *Pearson*, 555 U.S. at 227.

### a.   Due Process

To implicate the Due Process Clause of the Fourteenth Amendment, a plaintiff

must show that he has a property or liberty interest that has been affected by the

government action. *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972).  Here,

Defendants argue that Plaintiff suffered no deprivation of a protected property or liberty

interest by any of their actions.  Further, they assert that there is no liberty interest in

having unlimited access to a public building and that Plaintiff did not have a

constitutionally protected right to use of the DCRC.  Thus, they argue that qualified

immunity should be granted to the individual Defendants because there was no violation

of the Fourteenth Amendment and procedural due process.

Plaintiff argues on the other hand that the right to access to public places was

well-established by *City of Chicago v. Morales*, 527 U.S. 41 (1999).  *Morales* held that

"the freedom to loiter for innocent purposes [in a public place] is part of the 'liberty'

protected by the Due Process Clause of the Fourteenth Amendment. *Id.* at 53.  It

further stated that "an individual's decision to remain in a public place of his choice" is a part of his liberty. *Id.*; *see also Catron v. City of St. Petersburg*, 658 F.3d 1260, 1266 (11th Cir. 2011) ("Plaintiffs have a constitutionally protected liberty interest to be in parks or other city lands of their choosing that are open to the public generally"). Plaintiff asserts that the orders of Officer Stasi, authorized by Camp and enforced by Defendants Kelly and Jaycox, are the type of injunction on future conduct *Morales* and *Catron* found violated the Fourteenth Amendment.

Here, however, the issue here is not whether Plaintiff had a constitutionally protected right to access to the DCRC.  This is because the evidence, even viewed in the light most favorable to Plaintiff, does not show that Plaintiff was permanently banned from the facility.  Instead, the evidence shows that a protection order was entered against Plaintiff after his arrest in October 2011 for harassment and that Plaintiff did not return to the facility while he believed the protection order was in place.  This was due to his own conduct in connection with the harassment charge; the fact that he believes the harassment charge was not warranted is immaterial.  As the Eleventh Circuit in *Catron* noted, "a person may forfeit" the liberty interest in access to public property "by trespass or other violation of law."  658 F.3d at 1266.

Plaintiff did not return to the facility until November 2012, and used the facility without incident on November 19, 2012.[8]   Plaintiff was only asked to leave the facility

---

[8] His return appears to have based on his belief that the protection order expired on November 15, 2012.  Technically, however, the terms of Plaintiff's deferred sentence were still in place on November 21, 2012, such that the protection order had not expired.  Plaintiff's sentence was not dismissed until November 27, 2012 (Ex N), at which time I find the protection order expired.  (*See* Ex. G, stating that the protection order "remains in effect until final disposition" of the case, which means "until the case is dismissed, until the Defendant is acquitted, or until the Defendant completes his/her sentence."  (*Id.*)  The

on one occasion—on November 21, 2012. The evidence is undisputed that Defendant Jaycox (with Kelly's assistance) asked Plaintiff to leave based on their reasonable belief that Plaintiff should not be at the DCRC in light of his lengthy absence since his arrest, Plaintiff's past troubling behavior, and their understanding that a protection order existed regarding a DCRC employee (Woodward) who was supposed to be on duty that day.

I find that a one time restriction from use of a public facility based on the employees' reasonable belief that the person was precluded from the facility due to a protection order does not implicate a liberty interest.  As the Second Circuit noted, the established right to travel within a state protects *movement between places* and has no bearing on *access* to a particular place.  *Williams v. Town of Greenburgh*, 535 F.3d 71, 75 (2d Cir. 2008) (emphasis in original).  The Second Circuit found that a municipality's decision to limit access to its facilities did "not interfere with the right to free movement . . . [and thus plaintiff's] expulsion and temporary exclusion from the Center did not deprive him of a liberty interest . . . ."  *Id.* at 76; *see also Doe v. City of Lafayette*, 377 F.3d 757, 768-73 (7th Cir. 2004) (finding that plaintiff's right to enter and use city parks was not fundamental, particularly where plaintiff was a convicted sex offender and ban was aimed at protecting children); *Royer v. City of Oak Grove*, 374 F.3d 685 (8th Cir. 2004) (agreeing with district court that Royer could point to no property interest in having unlimited access to a public building, and affirming grant of summary judgment on plaintiff's due process claim alleging that a limited ban on his presence in a city building violated his constitutional rights).

---

actual expiration date of the protection order is not material, however, to my analysis.

As to Officer Stasi, it is a closer call.  Plaintiff has presented evidence that Officer Stasi told him he was permanently trespassed from the facility.  He also asserts that he had to hire an attorney to return to the facility, and that he believes he is still subject to being asked to leave or arrested because of Officer Stasi's statements to him. However, there is no evidence other than his one time eviction on November 21, 2012, that Plaintiff was actually precluded from using the facility by Officer Stasi or anyone else.  It is also undisputed that Plaintiff has been using the facility without restriction since at least June 2013.  Under these circumstances, I find there is no evidence that any liberty interest was actually infringed by Officer Stasi or the other Defendants.

Moreover, even if a liberty interest is implicated, I find that Plaintiff has not and cannot demonstrate the violation of clearly established law.  Plaintiff has not pointed to any Tenth Circuit or Supreme Court precedent even remotely on point that would have placed Defendants on notice that their efforts to protect the employees of the DCRC and abide by a court protection order they reasonably believed prohibited Plaintiff from being at the facility violated a protected liberty interest, particularly as Plaintiff was only precluded from the use of the facility on one occasion.  Certainly Plaintiff has not shown that Defendants' limited restriction of his use of the DCRC was "clearly established at the time of the allegedly unlawful activity such that 'every reasonable officer [or public official] would have understood that what he [was] doing' violated the law.'"  *Kerns*, 663 F.3d at 1180 (quotation omitted).

Finally, to the extent Plaintiff relies on a state statute as constituting clearly established law; namely, Colo. Rev. Stat. § 18-9-110, this does not meet his burden.  A

right is clearly established only "'when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains.'" *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (quotation omitted).  A state statute does not constitute clearly established authority for purposes of qualified immunity.  *See, e.g., Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1158 (9th Cir. 2012); *Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003).  Moreover, the statute does not stand for the premise Plaintiff suggests.  There is no case law or authority that Colo. Rev. Stat. § 18-9-110 was intended to serve as a standard for which individuals could be excluded from public buildings.  Further, the statute is a criminal statute, and there is no private cause of action under the statute as discussed in Section III.B.3, *infra*.

Based on the foregoing, I grant Defendants' summary judgment motion as to the due process claim, and deny Plaintiff's summary judgment motion as to that claim.

b.　　First Amendment

Plaintiff's fourth claim for relief asserting retaliation under the First Amendment is not clearly expressed in his summary judgment motion and briefing.  It appears to be based on Plaintiff's assertion that his contacts with the Defendants, including his arrest and ban from DCRC and the ban from speaking to DCRC employees, were based on his complaints about the employees, the expression of his political beliefs, and/or Defendants' knowledge of his blog which contained what Plaintiff characterizes as controversial political conduct.  He asserts that this conduct was constitutionally protected activity.  Moreover, he argues that exclusion from therapeutic swimming at the

DCRC would chill an ordinary person from complaining about government conduct. Defendants argue, on the other hand, that Plaintiff cannot show a constitutional violation because he cannot meet the elements for a First Amendment retaliation claim, and that Plaintiff cannot demonstrate that Defendants' actions violated clearly established law.

Construing the evidence in the light most favorable to Plaintiff for purposes of Defendants' motion, I first address the evidence regarding Jaycox and Kelly. Plaintiff relies on Camp's incident description of the meeting with Plaintiff on October 7, 2011 which states that Plaintiff talked about his political views, that 9/11 was "deliberately planned and coordinated by the government", "about taking down President Obama and New York Mayor Michael Bloomberg", that Plaintiff was a federal whistleblower, that reporter Amy Goodman from Chicago sent Woodward to spy on him; and that Woodward was not working her 40 hours. (*Id.*) While it appears that Jaycox may have read the incident report, there is no evidence that the content of this report was relayed to Defendant Kelley. Moreover, there is no evidence that either Jaycox or Kelly read Plaintiff's blog.

There is evidence from Kelly that during the brief conversation with Plaintiff, Jaycox and Kelly on November 21, 2012, when Plaintiff was asked to leave the facility, Plaintiff said the federal government was targeting him. (Ex. H.) Moreover, Plaintiff asserts that he told Jaycox on that date that he faced retaliation as a result of a political cover-up, that Woodward was protected by the Mayor of Chicago, and that DCRC had "seized" on his visit for political purposes. (Ex. O.) Further, he states that he mentioned to Jaycox the political reasons behind his eviction from DCRC. Plaintiff denies

Defendants' contention that during all three instances of contact between him and Defendants, his comments only concerned his perceived unfairness regarding the consequences of his behavior at the DCRC.  He asserts that he commented to Jaycox, Kelly and Officer Stasi both about his treatment at DCRC and made statements about policies issues such as are referred to in his blog.

As to Officer Stasi, it is undisputed that he was told by Camp before Plaintiff's arrest on October 10, 2010, about Plaintiff's blog.  While it is also undisputed that Officer Stasi looked at the blog *after* Plaintiff's arrest and that it was not relevant to Plaintiff's arrest in October 2011, Officer Stasi later characterized the blog as anti-government, a "rant", and focusing on Barack Obama.  While there is no evidence that Officer Stasi saw Camp's incident report, he does indicate in his officer report that he was told by Camp that Plaintiff believed Woodward was a spy, that Plaintiff had stated he was a federal whistleblower, and that he would go on rants about 9/11 and the United States government.  (Ex. 9.)  Moreover, Officer Stasi's February 14, 2013 e-mail states that Plaintiff "voiced multiple concerns the government is against him and multiple high level employees are in cahoots with the [DCRC] to violate his rights."  (Ex. 10.)  Plaintiff also asserts that when Officer Stasi contacted him on October 10, 2011, Plaintiff became irate and yelled that Officer Stasi was violating his constitutional rights. He told Officer Stasi at that time that Woodward was a spy and was stealing hours from the DCRC, and complained Officer Stasi was a fascist and police are like Nazis.  He voiced concerns the government is against him and that multiple high-level government employees are in "cahoots" with the DCRC to violate his rights.  Officer Stasi did not,

however, believe these comments constituted complaints against the DCRC or the City of Durango.

Turning to my analysis, to establish a First Amendment retaliation claim, Plaintiff "must plead and prove (1) that []he was engaged in a constitutionally protected activity; (2) that a defendant's action caused h[im] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) Defendants' adverse action was substantially motivated as a response to Plaintiff's exercise of constitutionally protected conduct. *Becker v. Kroll*, 494 F.3d 904, 925 (10th Cir. 2007); *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007).

Even if I assume the first element is met, Plaintiff has not shown that the other two elements are established.  As to the second element, Plaintiff argues that a realistic threat of arrest is enough to chill First Amendment rights, citing *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002).  He asserts that his arrest by Officer Stasi and Stasi's statements he could not go back to the DCRC for life nor contact any staff in person or by phone would cause a reasonable person to not go back to the DCRC or contact any staff members and that this has chilled his speech.  I find no support for this argument in the record.  To prove a First Amendment deprivation, Plaintiff must provide competent evidence that (1) Defendants silenced him or (2) Defendants' actions had some actual, non-speculative chilling effect on his speech. *Williams*, 535 F.3d at 78; *Spear v. Town of W. Hartford*, 954 F.2d 63, 68 (2d Cir. 1992) (requiring plaintiff to show that defendants "inhibited him in the exercise of his First Amendment freedoms").

While there are genuine issues of material fact as to whether Officer Stasi told Plaintiff he was permanently banned from the DCRC, that he would be arrested if he returned, and that he could not communicate with DCRC employees, the evidence is undisputed that Plaintiff was ejected from the facility on only one occasion and has been using the DCRC without incident since June 2013.  There is no evidence that Defendants actually silenced Plaintiff in any way, or that their actions actually had a chilling effect on his speech.  Plaintiff does not allege that he stopped writing in his blog or was precluded from any other First Amendment activity as a result of Defendants' actions.

As to the third element, Plaintiff has not shown, other than through conclusory and unsubstantiated statements in his affidavit, that Defendants' actions in arresting him, excluding him from the DCRC on November 21, 2012, and the other minimal contacts they had with Plaintiff were substantially motivated by any of Plaintiff's speech that could be deemed to be of public or constitutional concern, *i.e.,* his blog, political comments, or complaints about DCRC employees.  "Mere allegations of constitutional retaliation will not suffice"; rather, Plaintiff must "allege specific facts showing retaliation because of the exercise of [his] constitutional rights." *Frazier v. Dubois*, 922 F.2d 560, 562 n.1 (10th Cir. 1990).  "A plaintiff must allege facts to show that retaliation was the animus behind the defendants' actions, i.e., a plaintiff must show that 'but for' a desire to retaliate, the defendants would not have acted as they did." *Magluta v. U.S. Fed. Bureau of Prisons*, No. 08-cv-00404-CMA-MJW, 2009 WL 1504749, at *3 (D. Colo. May 27, 2009).

The evidence in this case shows that Plaintiff was arrested on October 10, 2011, by Officer Stasi as a result of DCRC employees' complaints of harassment by Plaintiff, Plaintiff's threats, and the employees' fears for their safety. While Officer Stasi was aware of Plaintiff's blog at the time of the arrest, he had not read the blog and it is undisputed that the blog was not relevant to the arrest. Further, the blog had no relevance to concerns about Plaintiff's behavior and safety of DCRC staff and was unrelated to enforcement of the protection order. While the evidence shows that Officer Stasi was aware of political comments by Plaintiff, there is no evidence that this was the reason for the arrest for harassment or the criminal case that was ultimately filed against Plaintiff (of which Defendants had no actual part).

Moreover, the evidence is undisputed that the decision of Jaycox and Kelly to evict Plaintiff from the facility on November 21, 2012, was due to Plaintiff's past behavior and their reasonable and, ultimately, accurate belief that a protection order remained in place. When Officer Stasi contacted Plaintiff by telephone two days later, on November 23, 2012, this was based on Defendant Jaycox's request that he contact Plaintiff and tell him that he was trespassed from the facility due to his conduct and the protection order that Defendants reasonably believed was still in place. Plaintiff has presented no evidence from which a reasonable factfinder could find retaliatory motive based on constitutionally protected speech. *See Worrell v. Henry*, 219 F.3d 1197, 1213 (10th Cir. 2000).

Finally, I also find that Plaintiff has not cited any clearly established law that Defendants violated in connection with their actions. It cannot be said that, at the time

of the incidents in question, every reasonable person in Defendants' position would have known that what they were doing violated a constitutional right and that the issue was beyond debate.  *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011).  Plaintiff has cited no Tenth Circuit or Supreme Court precedent that would have placed Defendants on notice that their limited conduct in arresting Plaintiff for harassment, evicting him from the DCRC on November 21, 2012, based on a protection order they reasonably believed was still in place, or contacting him by telephone on November 23, 2012, to tell him that he was trespassed from the facility based on the protection order and Defendant's prior conduct, violated any constitutional right.

I also find the Tenth Circuit's recent decision in *Pippin v. Elbert County, Colo.*, No. 14-1082, 2015 WL 858257 (10th Cir. 2015) instructive on this issue.  There, Pippin was using Colorado's Open Records Act to investigate a hunch that county officials were squandering tax money.  *Id.* at *1.  As part of his investigation, Pippin took action that worried the officials such as leaving messages the officials deemed threatening, raising his voice during visits to the County building, and taking pictures of the security cameras.  The county commissioner sought and obtained a temporary order restraining Pippin from coming near the County building.  *Id.*[9]  Pippin sued for damages claiming that the county officials had retaliated against him for exercising his First Amendment rights.  *Id.*  He disputed "whether the defendants' actions in seeking the permanent protective order offended his clearly established rights."  *Id.*  Pippin claimed "the

---

[9] The order was dissolved after a week when a court concluded there was insufficient evidence that Pippin presented an imminent danger.

defendants should've known better than to seek that relief because. . .he told them he was photographing the County offices not with plans to hurt anyone but only because he was intent on investigating whether officials had spent too much money on new security cameras." *Id.* The case bears certain similarities to this case.

The Tenth Circuit in *Pippin* upheld the district court's finding that the officials were entitled to qualified immunity.  2015 WL 858257, at *1.  It found that "while Pippin points to cases that establish the cardinal principle that public officials may not retaliate against citizens for exercising their First Amendment rights. . .[,] none of these authorities clearly indicates that public officials are disabled from seeking civil protective relief . . . against seemingly legitimate threats to the safety of their persons. . . ." *Id.*  It further stated, "[i]t's unclear to us. . . why reasonable officials would have had to accept Mr. Pippin's protestations about the innocence of his intentions at this point when a neutral magistrate had just verified the defendants' safety concerns by issuing a temporary restraining order." *Id.*  It concluded that Pippin did not identify any clearly established law compelling such a conclusion. *Id.*

Finally, to the extent Plaintiff argues that the existence of a criminal statute, Colo. Rev. Stat. § 18-9-110, constitutes notice that Defendants' conduct was prohibited, I disagree.  As previously noted, a state statute such as the one at issue right does not constitute clearly established law that would put an official on notice that his conduct violates a constitutional right.  Moreover, Plaintiff fails to cite to any authority that § 18-9-110 stands for the proposition for which he claims—that it was intended to serve as a standard for which individuals could be excluded from public buildings.  Indeed, the

statute expressly constitutes a criminal statute and does not provide a private cause of action, as discussed in Section III.B.3, *infra*.

Based on the foregoing, I grant Defendants' summary judgment motion as to the fourth claim for relief under the First Amendment, and deny Plaintiff's summary judgment motion as to this claim.

### 2.   Municipal Liability

Plaintiff alleges in his third claim that the City of Durango failed to provide training to its police officers or employees or provided insufficient training or written guidelines about under what conditions they may exclude a person from public facilities as are stated in Colo. Rev. Stat. § 18-9-110 (1) & (3), and for how long they may be excluded. He also alleges that the City of Durango gave police and employees unbridled discretion to determine who may use public facilities, who may be excluded, and when those previously excluded may use the premises in the future.  Further, he alleges that the City provided no post-deprivation procedure, written guidelines or opportunity for Plaintiff to challenge and present evidence why he should not be subject to an indefinite ban on use of DCRC or to conditions for his use of the facility other than those to which the general public is subject.  (*See also* Pl.'s Mot. Summ. J., Movant's Statement of Material Facts, ¶¶ 40-42.)

I find that Defendants' motion for summary judgment should be granted as to this claim, and Plaintiff's motion denied.  First, the Tenth Circuit has made clear that "a necessary condition for holding a municipality liable under § 1983 is the establishment of a constitutional violation by its officers or agents."  *Shue v. Larimer Cnty. Detention*

*Center*, No. 13-8064, 2014 WL 6807739, at *2 (10th Cir. 2014) (citing *Trigalet v. City of Tulsa*, 239 F.3d 1150, 1155-56 (10th Cir. 2001)).  As I have found no constitutional violation in connection with the individual Defendants, municipal liability does not lie.

Moreover, I find that Plaintiff has not presented evidence of any municipal policy or custom.  Instead, he seeks to impose liability on the basis of a single incident when he was asked to leave the DCRC.  As the Tenth Circuit has noted, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose [municipal] liability" because a single event cannot establish a custom or a persistent practice.  *Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993); *Moss v. Kopp*, 559 F.3d 1155, 1169 (10th Cir. 2009).

The record also contains no facts showing a municipal policy, custom or lack thereof that caused Plaintiff's alleged injuries.  "In order for a municipality to be held liable under § 1983 for a constitutional violation, the plaintiff must be able to establish 'official policy as the moving force of the constitutional violation.'"  *Shue,* 2014 WL 6807739, at *2 (quoting *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978)).  Here, there is no evidence that the City had notice that its actions, or failure to act, were likely to result in constitutional violations.  There likewise is no evidence that the City consciously chose to disregard the risk of harm.  *See Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (requiring direct causal link between lack of policy or lack of training and alleged injury).

Finally, Plaintiff has not shown that the City's training or failure to train was the moving force behind the alleged constitutional violation.  The record is devoid of any

evidence of a system of inadequate training to which the City was deliberately indifferent and that caused Plaintiff's alleged injuries.  Plaintiff has not specifically identify any requisite training that is lacking or deficient, particularly as it is undisputed that the protection order was still valid on November 21, 2012 and Plaintiff's criminal case remained open.  Plaintiff argues, however, that exclusion from public property is a reasonably common occurrence so the City would know it would occur and should have training on this issue.  He also argues that he is not required to prove the existence of a pervasive problem or that the Chief of Police was personally aware of the problem and chose to ignore it, citing *Brown v. Gray*, 227 F.3d 1278 (10th Cir. 2000).  *Brown* held in a failure to train case that "a single incident of excessive force can establish the existence of an inadequate training program if there is some other evidence of the program's inadequacy." *Id.* at 1286.  Here, however, there was no constitutional violation such as excessive force, nor is there any other evidence of how the City's training or lacked thereof caused Plaintiff's injury.

Without a causal connection establishing that the City was the "moving force" behind the constitutional deprivation, Plaintiff's claim fails as a matter of law.  *Monell*, 436 U.S. at 694; *Carney v. City and Cnty. Of Denver*, 534 F.3d 1269, 1273 (2008).

### 3.    Declaratory Judgment Claim

Finally, Plaintiff's second claim seeks a declaratory judgment that his rights under the First and Fourteenth Amendments have been violated and that Plaintiff had a right to be at the DCRC pursuant to Colo. Rev. Stat. §§ 18-9-110 (1) and (3).  I previously found that Plaintiff has not established violations of the Fourteenth or First

Amendments.  As to Colo. Rev. Stat. § 18-9-110(1) and (3), this is a Colorado criminal statute and I agree with Defendants that it does not provide a cause of action for civil litigation.  Thus, it does not provide a proper basis for a declaratory judgment.

Though a provision of a criminal penalty does not necessary preclude implication of a private cause of action, a "bare criminal statute," which contains absolutely no indication that a civil remedy is available, does not provide a basis from which to infer a private cause of action.  *Creech v. Fed. Land Bank of Wichita*, 647 F. Supp. 1097, 1099 (D. Colo. 1986); *see also Hurtado v. Brady*, 165 P.3d 871, 876 (Colo. App. 2007) (finding that plaintiff may not recover civil damages for an alleged violation of a criminal statute).  Indeed, congressional intent to create such a remedy, the most important factor to consider when determining if an implied private remedy exists, cannot be found on the face of this statute.  *See Creech*, 657 F. Supp. at 1099.  Instead, the purpose of the statute is to provide protection against interference with the legislative process. Colo. Rev. Stat. § 2-2-401.  Accordingly, not only does this statute fail to provide a private cause of action to support Plaintiff's claims, but there is no legislative intent to support an implied private remedy.[10]

Moreover, "[a] declaratory judgment action must be based on an actual controversy, and the plaintiff must allege an injury in fact to a legally protected or cognizable interest."  *Am. Civil Liberties Union of Colo. v. Whitman*, 159 P.3d 707, 709 (Colo. App. 2006).  "The injury-in-fact element of standing is established when the

---

[10] Plaintiff also admits that he "does not allege a cause of action under the statute" and admits that the statute does not state that a civil remedy is available.  (Pl.'s Resp. to Defs.' Mot. Summ. J., at 19.)

allegations of the complaint, along with any other evidence submitted on the issue of standing, establishes that the [statute] threatens to cause injury to the plaintiff's present or imminent activities." *Bd. of Cnty. Comm'rs, La Plata Cnty. v. Bowen/Edwards Associates, Inc.*, 830 P.2d 1045, 1053 (Colo. 1992).  Here, it is undisputed that Plaintiff has been able to use the DCRC's facilities since at least June 2013.  Moreover, Plaintiff has not shown that he has a right to unfettered DCRC access.  Therefore, Plaintiff has no standing for declaratory judgment as requested.

Finally, it is undisputed that no criminal matter related to § 18-9-110 has been initiated.  This statute did not serve as a basis for Plaintiff's arrest for harassment.  Therefore, this Court does not have standing to implement a declaratory judgment that this statute has been violated.  Defendants' Motion for Summary Judgment is granted and Plaintiff's Motion for Summary Judgment is denied as to this claim.

IV.   <u>CONCLUSION</u>

Based upon the foregoing, it is

ORDERED that Defendants' Motion for Summary Judgment (ECF No. 57) is **GRANTED** in its entirety.  Plaintiff's Motion for Summary Judgment (ECF No. 100) is **DENIED.**  Judgment shall enter in favor of Defendants and against Plaintiff on all claims in this action.

Dated:  March 31, 2015

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge